**TRENK, DiPASQUALE,**
**DELLA FERA & SODONO, P.C.**
347 Mount Pleasant Avenue
West Orange, New Jersey 07052
(973) 243-8600
Richard D. Trenk (RT 6874)
Thomas M. Walsh (TW 0645)
Proposed Attorneys for Debtor-in-Possession,
Coral Dyeing & Finishing Corp.

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re:<br><br>CORAL DYEING & FINISHING CORP.,<br><br>Debtor. | Chapter 11<br><br>Case No. 13-29792 (___) |

**DECLARATION OF FREDERICK DOMBROW, JR.**
**IN SUPPORT OF FIRST DAY MATTERS**

  I, **FREDERICK DOMBROW, JR.**, being of full age, hereby declare as follows, pursuant to 28 U.S.C. § 1746:

  1.  I am the Chief Executive Officer of Coral Dyeing & Finishing Corp. ("Coral" or the "Debtor"), the debtor and debtor-in-possession in the above-captioned chapter 11 bankruptcy case. I am authorized by Coral's Board of Directors to submit this Declaration. I am fully familiar with the business and affairs of the Debtor, including the facts and circumstances set forth herein.

  2.  I submit this declaration (the "Declaration") in support of the Debtor's voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") and the relief that the Debtor has requested from the Court in various motions and applications

filed contemporaneously herewith (the "First-Day Pleadings"). I believe that the relief sought in each of the First-Day Pleadings (i) is necessary to enable to the Debtor the operate in chapter 11 with minimal disruption in its operations or loss of value and (ii) best serves the interests of the Debtor's estate and creditors.

3. Except as otherwise indicated, the facts set forth in this Declaration are based upon my personal knowledge, information supplied to me by other members of the Debtor's management or its professionals, information learned from my review of relevant documents, or my opinion based upon my experience and knowledge of the Debtor's operations and financial condition. This Declaration is intended to provide a brief background of Coral, the reasons for Coral's chapter 11 filing, Coral's objectives in the chapter 11 process, and a summary of the relief sought in each of the First-Day Pleadings. If called as a witness in the Debtor's bankruptcy proceedings, I could and would testify competently to the facts set forth in this Declaration. Unless otherwise indicated, all financial information set forth in this Declaration is presented on an unaudited basis.

## BACKGROUND

4. Founded in 1955 under the guidance of my father, Fred Dombrow, Sr. ("Dombrow Sr."), a high-level textile manufacturer and machinist, Coral is largely responsible for transforming the City of Paterson, New Jersey into "Silk City," a global epicenter for textile manufacturing. Since its inception, the mission of Coral has been to create and utilize state-of-the-art machinery designed to save time, money, and labor in the textile trade.

5. During the 1980s, I joined my father at Coral. Beginning as a welder, I soon became a high-level machinist and hands-on chemist responsible for creating modernized fabric equipment that reduced the need for hard labor. Currently, I am the sole owner of Coral.

6. By the 1990s, Coral stood alone as the only remaining large industrial dye house in the City of Paterson. Coral operates out of a 120,000 square foot warehouse located at 555 East 31st Street in Paterson, New Jersey. Coral presently employs approximately forty-four (44) individuals, the majority of which are Paterson residents.

## CIRCUMSTANCES LEADING TO BANKRUPTCY

7. In 2004 through 2005, Coral was affected by a year-long labor strike, which had a lasting detrimental impact upon its operations and client relations.

8. Thereafter, with revenues down during the period between 2008 and 2010, Coral found itself insufficiently financed to handle the economic changes facing its once-thriving industry.

9. In 2012, at a period in which Coral was enjoying an upward sales trend that would otherwise have provided for a critical shift in momentum, operations were fully shut down during November and December, which were typically Coral's busiest months, as the result of Hurricane Sandy. As a result of Hurricane Sandy, Coral lost over 20,000 square feet of the roof of its building, which impaired operations through February 2013.

## THE DEBTOR'S CHAPTER 11 FILING

10. Coral filed its chapter 11 petition on September 9, 2013 (the "Petition Date"). Coral has approximately $4,000.00 cash on hand and on deposit as of the Petition Date, and it proposes to use its cash and future revenues in accordance with the debtor-in-possession operating budget annexed to Exhibit "A."

## FIRST-DAY MOTIONS

11. Concurrently with the filing of its chapter 11 petition, Coral has filed certain Motions and proposed Orders (collectively, the "First Day Orders"). The Debtor requests that

each of the First Day Orders described below be entered, as each constitutes a critical element in achieving a successful result in the Debtor's chapter 11 case for the benefit of all parties-in-interest.

    (i)    **Debtor's Motion for Order Pursuant to 11 U.S.C. §§ 105(A), 507(A)(4) and 507(a)(5): (A) Authorizing the Debtor to Pay Pre-Petition Wages, Salaries, Withholding and Payroll Related Taxes for Pre-Petition Periods; (B) Directing All Banks to Honor Pre-Petition Checks for Payment of Pre-Petition Employee Obligations; (C) Authorizing Debtor to Honor Workers' Compensation and Certain Employee Benefit Obligations; and (D) Authorizing Debtor to Pay Prepetition Debts of Physicians Performing Critical Services (the "Wages Motion")**

12.    The continued and uninterrupted service of the Employees is essential to the Debtor's continuing operations. To minimize the personal hardship the Employees will suffer if pre-petition Employee-related obligations are not paid when due, and to maintain the Employees' morale during this critical time, the Debtor, through the Wages Motion, seeks entry of an order (a) granting the Debtor authority to pay pre-petition wages, salaries, and withholding and payroll taxes for pre-petition periods; (b) directing all banks to honor pre-petition checks for payment of pre-petition employee obligations; and (c) permitting the Debtor to honor workers' compensation and certain employee benefit obligations (collectively, the "Employee Programs").

13.    The Debtor also (i) requests that the Court authorize and direct applicable banks and other financial institutions to receive, process, honor and pay all pre-petition checks and transfers drawn on the Debtor's payroll accounts and to make the foregoing payments and (ii) seeks authority to pay all processing costs and administrative expenses related to the foregoing payments, if any. The Debtor submits that any payments that will be made in connection with pre-petition wages, salary, other compensation and benefit programs will not exceed the sum of $11,725.00 per employee entitled to priority under sections 507(a)(4) and (5) of the Bankruptcy Code.

      a.    **Summary of the Debtor's Pre-Petition Employee Obligations Weekly Wages, Salaries, and Other Compensation**

14. The Employees are paid on a weekly basis on Fridays. The Debtor employs the services of Balance Point Payroll to calculate and issue the Employees' paychecks and direct deposits. These paychecks are drawn on the Debtor's bank account. The Debtor seeks an order authorizing it to pay all outstanding wages, salaries, and other compensation owed to the Employees.

      b.    **Vacation, Sick, Personal Leave, and Holidays**

15. The Debtor seeks an order authorizing, but not directing, it to honor all liabilities to the Employees with respect to vacation, sick pay benefits, personal days, and paid holidays that arose prior to the Petition Date and to continue its pre-petition policies with respect to same going forward. The Debtor anticipates that the Employees will utilize any accrued vacation, sick leave, or personal days in the ordinary course, without resulting in any material cash flow requirements beyond the Debtor's normal payroll obligations.

      c.    **Reimbursable Business Expenses**

16. In the ordinary course of Coral's operations, Employees may incur a variety of business expenses that are typically reimbursed by the Debtor pursuant to its normal business practices (hereinafter, "Reimbursable Business Expenses"). All Reimbursable Business Expenses were incurred with the understanding that they would be reimbursed by the Debtor. The Debtor seeks an order authorizing, but not directing, it to pay all pre-petition Reimbursable Business Expenses.

      d.    **Health Insurance Benefits**

17. In the ordinary course of its operations, Coral provides medical, prescription drug, and dental insurance to its Employees (the "Health Benefits"). Coral self-insures the Health

Benefits, which are administered by AmeriHealth and Express Scripts (collectively, the "Administrators"). The Debtor seeks an order authorizing, but not directing, it to continue providing the Health Benefits and paying the obligations associated therewith to the Administrators.

### e.   Workers' Compensation Obligations

18.   Under the laws of the State of New Jersey, Coral is required to maintain workers' compensation policies and programs to provide the Employees with workers' compensation coverage for claims arising from or related to their employment with the Debtor. Accordingly, the Debtor maintains workers' compensation policies and programs pursuant to the applicable requirements of local law.

### f.   Authority for Banks to Honor and/or Reissue Checks

19.   Coral further requests that all applicable banks and other financial institutions be authorized to receive, process, honor, and pay any and all checks and transfers drawn on the Debtor's dedicated payroll accounts, whether such checks were presented before, or are presented after, the Petition Date. The Debtor seeks (i) authorization for and/or ratification of its banks' honoring of pre-petition payroll checks and transfers on or after the Petition Date, (ii) authorization for the banks to process and honor all other checks issued for payments approved by the Court, and (iii) authorization to reissue checks for payments approved by the Court where any check therefor is dishonored post-petition.

    **(ii)**     **Debtor's Motion for a Bridge Order and Final Order (I) Prohibiting Utility Companies from Discontinuing, Altering or Refusing Service, (II) Deeming Utility Companies to Have Adequate Assurance of Payment, and (III) Establishing Procedures for Resolving Requests for Additional Assurance Pursuant to 11 U.S.C. §§ 105(a) and 366 (the "Utilities Motion")**

20. In the operation of its business, Coral incurs utility expenses in the ordinary course of business for, among other things, water, electricity, gas, and telephone service (the providers of such utility services are the "Utility Companies"). Uninterrupted utility services are essential to the Debtor's ongoing operations. Indeed, any disruption to the Debtor's operations by virtue of the cessation of utility services by the Utility Companies will bring Coral's operations to an abrupt halt. If one or more of the Utility Companies refuse or discontinue service even for a brief period, Coral's operations would be severely disrupted. This would cause immediate, irreparable harm to the Debtor, and would ultimately adversely affect Coral's chapter 11 efforts, to the detriment of its estate, its creditors, and the Employees. It is therefore critical that utility services provided to Coral continue uninterrupted.

21. Through the Utilities Motion, Coral seeks entry of (i) a Bridge Order and (ii) a Final Order, pursuant to sections 105(a) and 366 of the Bankruptcy Code, (a) prohibiting its the Utility Companies from discontinuing, altering, or refusing service to the Debtor, except as set forth herein, (b) deeming the Utility Companies adequately assured of future performance on the basis of payment of a two-week security deposit (the "Utility Deposit"), and (c) establishing procedures for resolving requests for additional assurance of payment. The Utility Companies are identified on Exhibit "A" to the Utilities Motion.

    (iii)    **Motion for an Order (A) Authorizing Debtor to Continue Using Existing Cash Management System, Bank Accounts, and Business Forms; and (B) Granting a Waiver of the Deposit Guidelines Set Forth in Section 345 of the Bankruptcy Code (the "Cash Management Motion")**

22.    In the Cash Management Motion, Coral seeks entry of an order (a) authorizing Coral to continue using its existing cash management system, bank accounts, and business forms; (b) granting a waiver of the deposit guidelines set forth in section 345 of the Bankruptcy Code; and (c) granting such other relief as this Court deems just and equitable.

    a.    **Request to Maintain Bank Accounts and Cash Management System**

23.    In the ordinary course of its operations, Coral maintains a cash management system (the "Cash Management System") to receive and disburse funds. In order to lessen the disruption caused by the bankruptcy filing and maximize the value of its estate in this chapter 11 case, it is vital to Coral that it maintain its existing system of managing cash.

24.    Currently, Coral has four (4) bank accounts (collectively, the "Bank Accounts"). In the ordinary course of its operations, Coral receives, deposits, and issues checks, wire transfers, and ACH transfers into and out of its checking account.

25.    The Cash Management System includes the necessary accounting controls to enable Coral, as well as its creditors and the Court, to trace funds through the system and ensure that all transactions are adequately documented and readily ascertainable. Coral maintains and will continue to maintain detailed and accurate accounting records reflecting all transfers of funds. Coral's cash management procedures are ordinary, usual, and essential business practices. They are similar to those used by other corporate enterprises and provide significant benefits to Coral, including the ability to (a) accurately and immediately report receipts and expenditures; (b) control corporate funds centrally; (c) ensure the availability of funds when necessary; and (d) reduce administrative expenses by centralizing the movement of funds.

### b.  Request for Authorization to Maintain Existing Business Forms

26. Coral also seeks authority to continue to use its pre-petition business forms, including, but not limited to, letterhead, invoices, checks, and deposit slips (collectively, the "Business Forms"), without reference to its status as a debtor-in-possession. Requiring Coral to immediately print new business forms will be burdensome, expensive, and disruptive, particularly in light of the nature and scope of its operations and the expected discontinuance of its operations in the near future.

27. Coral submits that authorization to use the Business Forms will facilitate a smooth and orderly chapter 11 case and minimize the disruption to Coral's operations (without violating the policies underlying the Bankruptcy Code). Accordingly, Coral requests that it be authorized to use its existing Business Forms without being required to label each with the "debtor-in-possession" identifier.

### c.  Request for Waiver of Section 345 Guidelines

28. Coral seeks a waiver of the deposit guidelines set forth in section 345(b) of the Bankruptcy Code to permit Coral to maintain its existing Bank Accounts even though the balance in the operating account may, from time to time, exceed the amount insured by the FDIC.

### (iv)  Debtor's Motion Seeking Authorizing for the Interim and Final Use of Cash Collateral

29. Coral seeks authorization to use any cash collateral in the ordinary course of its business in accordance with the budget annexed hereto as Exhibit "A" because secured creditors are adequately protected. Coral respectfully submits that it is in the best interest of Coral and its estate that Coral's operations be permitted to continue. For that to occur, Coral must be authorized to use the cash collateral. A hasty liquidation of Coral's assets is contrary to the best

interests not only of Coral, but also to Coral's creditors, both secured and unsecured.

I hereby declare that the foregoing statements made by me are true. If any of the foregoing statements made by me are willfully false, I recognize that I am subject to punishment.

Dated: September 9, 2013					/s/ Frederick Dombrow, Jr.
							FREDERICK DOMBROW, JR.

779081_1

# EXHIBIT A

Coral Dyeing and Finishing
3 Month Projection

| | Projected Sept 2013 | Projected Oct 2013 | Projected Nov 2013 |
|---|---|---|---|
| **Revenues** | | | |
| Income from Dyeing | $365,000 | $375,000 | $385,000 |
| Customer Discounts | $3,000 | $2,000 | $1,000 |
| Rent and Other Income | $10,000 | $10,000 | $10,000 |
| **Total Revenues** | $378,000 | $387,000 | $396,000 |
| **Cost of Sales** | | | |
| Dyestuff | $30,000 | $30,000 | $30,000 |
| Finishing Chemicals | $39,000 | $39,000 | $39,000 |
| Labor - Dyehouse | $32,000 | $32,000 | $32,000 |
| Labor - Pads & Rangers | $8,000 | $8,000 | $8,000 |
| Labor - Greige | $13,000 | $13,000 | $13,000 |
| Labor - Finishing | $18,000 | $18,000 | $18,000 |
| Labor - Shipping | $18,000 | $18,000 | $16,000 |
| Labor - Maint & Fireman | $17,000 | $13,000 | $13,000 |
| **Total Cost of Sales** | $175,000 | $171,000 | $169,000 |
| **Gross Profit** | $203,000 | $216,000 | $227,000 |
| **Expenses** | | | |
| Car Allowance | $500 | $500 | $500 |
| Delivery Expense | $2,000 | $2,000 | $2,000 |
| Insurance - Health | $7,000 | $7,000 | $7,000 |
| Insurance - Workers Comp** | $10,500 | $10,500 | $10,500 |
| Insurance - General | $3,000 | $3,000 | $3,000 |
| Office Expense / Computer | $2,000 | $2,000 | $2,000 |
| PR Services | $1,000 | $1,000 | $1,000 |
| PR Taxes | $17,000 | $16,000 | $16,000 |
| Real Estate Taxes | $11,000 | $11,000 | $11,000 |
| Premium Financing (Real Prop.) | $4,136 | $4,136 | $4,136 |
| Refuge/Cleaning | $2,000 | $2,000 | $2,000 |
| Rent to New York Susquehanna & Western Railway | $500 | $500 | $500 |
| Repair and Maintenance | $8,000 | $8,000 | $8,000 |
| Salaries - Office | $44,000 | $44,000 | $44,000 |
| Vacation Pay - Expense | $5,000 | $5,000 | $5,000 |
| Sewer Charge | $6,000 | $6,000 | $6,000 |
| Shipping Supplies | $4,000 | $4,000 | $4,000 |
| Utilities | $50,000 | $50,000 | $50,000 |
| Water | $7,000 | $7,000 | $7,000 |
| Utility Deposits | $11,892 | $11,892 | $11,892 |
| Misc Expenses | $2,000 | $2,000 | $2,000 |
| **Total Expenses** | $198,528 | $197,528 | $197,528 |
| **Net Income** | $4,472 | $18,472 | $29,472 |

** - subject to payroll audit